UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:                                                          Chapter 7

Lawrence Edward Feigen,                                          Case No. 8-26-70977-LAS
                                  Debtor.
----------------------------------------------------------------x

### DECLARATION OF LAWRENCE EDWARD
### FEIGEN IN SUPPORT OF MOTION TO DISMISS

I, **LAWRENCE EDWARD FEIGEN**, duly affirm under penalty of perjury that the following is true and correct:

1. I am the alleged debtor ("Alleged Debtor") in the above-captioned case. The facts set forth in this declaration ("Declaration") are personally known to me, and if called as a witness, I could testify thereto. I am fully familiar with the facts herein stated based upon my personal knowledge or knowledge derived from discussions with others, and/or my review of documents.

2. I submit this Declaration in support of the Alleged Debtor's motion to dismiss ("Motion to Dismiss") the above-captioned involuntary Chapter 7 bankruptcy proceeding filed by petitioning creditor, Platinum Management Services, LLC ("Petitioning Creditor") in the United States Bankruptcy Court, Eastern District of New York ("Court"), pursuant to Rule 1011(b) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Rule 12(b) of the Federal Rules of Civil Procedure ("FRCP"), made applicable to this proceeding pursuant to Bankruptcy Rules 7012(b) and 7009, respectively.

3. As set forth in greater detail in the memo of law ("Memo") annexed to the Motion to Dismiss, the involuntary bankruptcy is jurisdictionally defective because: (i) the involuntary petition was not supported by the minimum number of three (3) petitioning creditors required; and (ii) that all three (3) petitioning creditors are a holder of a claim against such person that is not

1

contingent as to liability or the subject of a bona fide dispute as to liability or amount. See 11 U.S.C. § 303(b)(1).

4.     As set forth herein, I have more than twelve (12) creditors with valid debts that are not contingent or subject to a bona fide dispute. Equally important and relevant to the Petitioning Creditor's bad faith, the Petitioning Creditor was advised prior to the Involuntary Petition Date (defined infra.) that I had more than 12 creditors with valid non-contingent debt and chose to ignore such notice and filed the Involuntary Petition regardless.

5.     Specifically, on February 24, 2026, my counsel, Gary Varnavides, emailed the Petitioning Creditor's counsel, Miriam Granek, and wrote, in relevant part: "At this juncture, we understand that Mr. Feigen, personally, has **more than** twelve (12) creditors." Shortly thereafter, Ms. Granek acknowledged and replied to my counsel's email as follows: "Thank you for this information…Please provide a list of [Mr. Feigen's] creditors." A copy of this email exchange is annexed hereto as **Exhibit A**.

6.     This Declaration sets forth how the origination and amount of my debt — most of which is derived from my involvement in the acquisition and operation of South City Hospital (formerly St. Alexius Hospital) in St. Louis, Missouri — demonstrates that this involuntary petition was filed in bad faith by a single creditor seeking a disproportionate advantage for itself rather than for the benefit of creditors generally. **Procedural History**

7.     On March 11, 2026 ("Involuntary Petition Date"), Petitioning Creditor filed this Chapter 7 Involuntary Petition against me in the Court. As noted, the Petitioning Creditor was the only petitioning creditor of the involuntary petition. It is undisputed that I have more than 12 creditors.

8. As set forth in the Memo, the Petitioning Creditor failed to submit a declaration of eligibility establishing that it has valid debt not unliquidated, contingent or subject to a bona fide dispute.

9. As set forth in greater detail herein, the Petitioning Creditor and I were negotiating a resolution of the Petitioning Creditor's Judgment when the involuntary petition was filed.

10. After the Involuntary Petition Date, on March 12, 2026, my counsel, Gary Varnavides sent an email to the Petitioning Creditor's counsel, Camille Raia states: "As you have repeatedly expressed to me, this matter is 'personal' to your client and he is very 'angry' at Mr. Feigen." Mr. Varnavides further warned that "[i]t is troubling that your client has resorted to improperly utilizing a bankruptcy court as a collection agency" and that "Mr. Feigen intends to present the substantial evidence of your client's objective bad faith and frivolous filing at the appropriate time in the bankruptcy proceeding." A copy of the email is annexed as **Exhibit B**.

A. **St. Louis Acquisition and Partnership with the Petitioning Creditor**

11. My professional background is as an executive in the skilled nursing facility industry. Throughout my career, I have owned and operated numerous skilled nursing facilities, primarily throughout Southern California.

12. In or about late 2020, I became involved in the acquisition and operation of a hospital facility and underlying real estate in St. Louis, Missouri, then known as St. Alexius Hospital, subsequently renamed South City Hospital ("SA Hospital"). In or about January 2021, SA Hospital was purchased out of bankruptcy by SA Hospital Acquisition Group, LLC ("SAH") and its affiliated entities, including SA Hospital Real Estate Holdings, LLC ("SARE").

13. The hospital was initially managed by Benjamim M. Klein ("Klein"), who is the Manager and Chief Executive Officer of Platinum Management Services, LLC (the Petitioning Creditor) and who signed the involuntary petition on behalf of the Petitioning Creditor.

14. Klein served as the managing member of SAH and SARE from January 19, 2021, through June 13, 2021. Klein's involvement with the hospital entities is the genesis of the Petitioning Creditor's judgment against me.

### i. Liquidation of SA Hospital

15. In or about August 2023, SA Hospital closed. Thereafter, a liquidation trust, SA Hospital Acquisition Group, LLC Liquidation Trust ("Liquidation Trust"), was formed to liquidate the assets of SA Hospital and pay its creditors. Rafael X. Zahralddin, Esq. of Lewis Brisbois serves as the Trustee of the Liquidation Trust ("Trustee"). The Trustee has been working diligently to pay SA Hospital's creditors in order of priority ("Waterfall").

16. Klein, along with Feigen and others, holds a secured priority (or "Class B") claim in the SA Hospital liquidation "waterfall", sitting only behind Twain (the sole "Class A" claim holder) in creditor priority. Importantly, Klein is a Class B creditor because of his ownership of NFS Leasing's secured debt (addressed further below)—*the very same claims and rights that form the basis of the judgment at issue that he holds against Feigen, and which Klein now seeks to enforce with this involuntary bankruptcy petition.*

17. Upon information and belief, the Trustee has been successful in liquidating a portion of SA Hospital's assets, generating more than $7 million in cash proceeds to date to pay off its senior secured creditor, Twain Financial. To date, Twain has been paid approximately $5.6 million of the $7 million that it has agreed to accept, demonstrating the Liquidation Trustee's success.

4

18. Importantly, The Trustee's liquidation efforts continue to generate cash to pay professional expenses needed to continue to locate and obtain additional cash proceeds to satisfy the Liquidation Trust's creditors.

19. As part of that liquidation effort, SA Hospital has accepted an offer from a buyer for its hospital operations that is subject to due diligence, which is underway.

20. Upon information and belief, the Trustee's ongoing liquidation activities will generate enough cash to pay off *Klein's secured rights entirely and therefore satisfy the underlying judgment in full.*

21. Except for my personal credit cards, all my debt arises from the personal guarantees I provided in connection with the acquisition of the SA Hospital. Notably, I am not the primary obligor on most of my debt.

22. Equally important, the debt associated with the SA Hospital is being administered through the liquidation process, including the Petitioning Creditor's Judgment (defined infra.). The Trustee, in fiduciary capacity of the Liquidating Trust, is currently overseeing the administration and liquidation of the SA Hospital's assets and will distribute proceeds to creditors, including the Petitioning Creditor, as part of this process.

23. Indeed, the SA Hospital assets in the Liquidating Trustee will satisfy a large portion (if not all) of the debt obligations for which I am personal guarantor.

24. There is no reason for an involuntary personal bankruptcy to pursue a personal guaranty when the primary obligator, SA Hospital, is being liquidated as part of a Liquidating Trust and the proceeds being administered to all creditors, including the Petitioning Creditor.

25. Nonetheless, the Petitioning Creditor elected to pursue enforcement of the personal guaranty against me, as set forth in greater detail herein.

### ii.    Petitioning Creditor's Judgment

26.    On or about June 14, 2021, Klein sold his interest in SAH and SARE to me and Jeffrey Ahlholm ("Ahlholm"), who is an investment banker based in Los Angeles, California. Consequently, Ahlholm and I became co-managing members and 90% owners of SAH and SARE, respectively.

27.    Operating a hospital is an extraordinarily complex undertaking involving numerous contractual relationships with lenders, contractors, service providers, equipment lessors, and other vendors. The disputes giving rise to the various creditor claims against me all arise from this complex web of relationships surrounding the acquisition and operation of SA Hospital.

28.    The Petitioning Creditor's claims against me arise from the personal guarantees by me and others of certain equipment leases between and SA Hospital and NFS Leasing, Inc. ("NFS Leasing"). Specifically, on or about January 19, 2023, NFS Leasing commenced an action against SAH, Klein, me, and others in the Essex County Superior Court, Massachusetts (Case No. 2377CV00066B). Klein settled with NFS Leasing for $1,500,000 in August 2023 and subsequently obtained an assignment of NFS Leasing's rights to enforce the personal guarantees of the leasing obligations against me, Ahlholm, and SA Hospital.

29.    Thereafter, Klein commenced an arbitration before the American Arbitration Association to enforce the personal guarantees of the leasing obligations against me and Ahlholm.

30.    On April 24, 2024, Arbitrator David A. Felice issued an arbitration award of $724,607.75 ($699,691.75 in compensatory damages plus $24,916.00 in costs) jointly and severally against me and Ahlholm.

31.    Klein, in his individual capacity, subsequently filed a Petition to Confirm the Arbitration Award under CPLR Article 75 in Nassau County Supreme Court, Index

No. 610421/2024 on June 13, 2024 ("First Nassau Action"). Notably, Klein filed the First Nassau Action solely against me and did not include Ahlholm despite his being jointly and severally liable.

32.    Thereafter, in or around July 2024, Platinum, on the one hand, and I, Ahlholm, and SAH, on the other hand, entered into a Settlement Agreement and Release, which required payment of $860,000 to the Petitioning Creditor in three installments. Upon the default under the Settlement Agreement by me and Ahlholm, on or about September 16, 2024, a judgment in favor of the Petitioning Creditor was entered against me, Ahlholm, and SAH, jointly and severally, in the principal amount of $1,100,000 in the Massachusetts Superior Court, Essex County ("Petitioning Creditor's Judgment").

33.    On April 29, 2025, Petitioning Creditor commenced a second action against me to domesticate Petitioning Creditor's Judgment in Nassau County Supreme Court captioned No. 609279/2025 ("Second Nassau Action"). Once again, the Petitioning Creditor commenced this action solely against me and did not name Ahlholm or SAH. The Petitioning Creditor's Judgment was domesticated on May 6, 2025.

34.    Following entry of the Petitioning Creditor's Judgment, the Petitioning Creditor served an Information Subpoena containing 42 detailed questions regarding my personal finances, employment, assets, and business interests. I fully cooperated with this post-judgment discovery process. I provided sworn responses to all 42 questions and on February 10, 2026, I produced approximately 10,000 pages of financial documents in response to the subpoena.

35.    Despite producing nearly 10,000 pages of documents, on February 12, 2026, just two days after I made this production, the Petitioner's Creditor's threatened my counsel in writing that my "judgment creditors may consider filing for an involuntary bankruptcy."

36.    Despite my full compliance, the Petitioning Creditor proceeded with a motion for contempt. My counsel filed a Pre-Trial Memorandum on February 12, 2026, in Nassau County opposing the contempt motion and demonstrating that it was moot given my complete compliance with the information subpoena.

37.    The contempt hearing was scheduled for March 12, 2026. However, due to being unexpectedly and temporarily stranded in Israel at that time because of the war with Iran after having multiple booked flights cancelled, on the evening of March 10, 2026, my counsel filed an emergency request for an adjournment of the contempt hearing with the Nassau County Court.

38.    Before filing the emergency request, my counsel contacted the Petitioning Creditor's counsel to explain my unforeseen circumstances and inquire whether Petitioning Creditor would consent to the adjournment. On March 10, 2026, at approximately 6:45 PM Eastern Time, Ms. Raia refused to consent to the adjournment. Later that evening, my counsel filed the emergency request.

39.    On March 11, 2026, at 10:30 a.m., the Honorable Judge Gianelli of the Nassau County Supreme Court granted my adjournment request and rescheduled the contempt hearing to May 7, 2026.  Notably, the adjournment was granted the same day as the Involuntary Petition Date—just six (6) hours before the stamp date on the involuntary petition. See ECF No. 1.

### iii    The Petitioning Creditor Seeks a Disproportionate Advantage for Itself

40.    The Petitioning Creditor's counsel, Camille Raia, has repeatedly expressed to my counsel that this matter is "personal" to her client (Klein/Platinum) and that Klein is very "angry" at me.

41.    The involuntary petition was filed mere hours after the Nassau County court granted my adjournment request due to my inability to leave Israel during the war with Iran.

8

42.     The Petitioning Creditor was already actively pursuing customary debt-collection remedies against me in Nassau County, including post-judgment discovery and contempt proceedings.

43.     Perhaps the most telling indicator of Platinum's bad faith is its singular and exclusive focus on me while taking no enforcement action whatsoever against my co-obligor, Ahlholm. The arbitration award upon which the Petitioning Creditor's claim is based was entered **jointly and severally** against both me and Ahlholm. The Petitioning Creditor's Judgment was also entered jointly and severally against me and Ahlholm.

44.     Despite holding a joint and several judgment against both me, Ahlholm, and SA Hospital, the Petitioning Creditor has <u>not</u> (i) sought to domesticate the judgment against Ahlholm, (ii) served information subpoenas on Ahlholm, (iii) filed contempt motions against Ahlholm, (iv) sought charging orders against Ahlholm's entity interests, and (v) filed an involuntary petition against Ahlholm.

45.     This selective and exclusive targeting of me alone — while completely ignoring co-obligors equally liable on the same debt — is evidence that the Petitioning Creditor is motivated by personal animus towards me rather than protecting the interests of all creditors.

46.     If the Petitioning Creditor's true purpose were the orderly collection of its debt, it would pursue all available judgment debtors. Its decision to focus exclusively on me, combined with its counsel's own admissions about Klein's personal anger, confirms that this involuntary petition is being used to harass and to obtain a disproportionate advantage, not to protect the interests of creditors generally.

47.     Moreover, on the Involuntary Petition Date of March 11, 2026, the Nassau County Court granted my adjournment request. As noted, I was in Israel due to the war with Iran and rather

than await the rescheduled hearing, the Petitioning Creditor chose to weaponize the bankruptcy process while I was overseas and unable to immediately respond. This suspicious timing is further evidence of bad faith.

48.    Equally important, at the time of filing, the parties were actively engaged in settlement negotiations to resolve the Petitioning Creditor's judgment. Filing an involuntary petition during active settlement discussions is inconsistent with a good faith effort to collect a debt and instead reflects a desire to exert maximum pressure through improper means.

## B.  Other Judgments Against the Alleged Debtor

49.    In addition to the Petitioning Creditor's Judgment, listed below I have set forth the other judgments obtained against me, primarily as a guarantor and not as the primary obligor, and against other individuals and entities jointly and severally.

50.    The information is provided to the Court as *prima facie* evidence that I have more than twelve (12) creditors holding valid, non-contingent debt that is not subject to bona fide dispute, and I am advised by my counsel that three (3) petitioning creditors is required under Bankruptcy Code section 303(b)(1).

51.    Notably, none of the other judgment creditors, all of whom have substantial judgments against me, were petitioning creditors. In fact, one of the largest judgment creditors, Modern HR, Inc. ("Modern HR"), filed a declaration in support of this Motion to Dismiss.

52.    The Modern HR Declaration makes unequivocally clear that one of the largest judgment creditors opposes this involuntary bankruptcy proceeding.

53.    These Declarations underscore that the Petitioning Creditor is improperly invoking the involuntary bankruptcy process for its own self-serving purposes, rather than in the collective

10

interests of the creditor body. This conduct reflects misuse of the bankruptcy system and further demonstrates that the Involuntary Petition is not being prosecuted in good faith.

### i.    CLS Judgment

54.    Specifically, on or about June 7, 2024, a judgment in favor of Commercial Loan Servicing, LLC ("CLS") and against myself, Ahlholm, SA Hospital Real Estate Holdings-Jefferson, LLC, jointly and severally, in the principal amount of $8,141.750.00, plus costs and interest at a rate of ten percent (10%) per annum from June 7, 2024, was entered in the Superior Court of California, County of Los Angeles, Case No. 22STCV37412 ("CLS Judgment").

55.    The CLS Judgment arises from two guaranties that I executed in connection with commercial loans to SA Hospital Real Estate Holdings-Jefferson, LLC.

56.    The first guaranty was executed on January 7, 2022, in the amount of $6,000,00, bearing interest at a rate of nine percent (9%) per annum from July 6, 2022.

57.    The second guaranty was executed on April 19, 2022, in the amount of $1,500,000.00 bearing interest at a rate of nine percent (9%) per annum from May 19, 2022.

58.    The CLS Judgment is my largest judgment. CLS also has a lien on a parcel of real property located in St. Louis, Missouri.  My counsel, CLS's counsel, and Ahlholm are in communication about the potential sale of such property to go towards partially satisfying the CLS Judgment.

### ii.    Modern HR Judgment

59.    On or about November 14, 2024, a judgment in favor of Modern HR was entered jointly and severally against me and Ahlholm in the principal amount of $407,394.52 in the Superior Court of Los Angeles County, North Central District, Case No. 23 BBCV00852 ("Modern HR Judgment").

60.     In December 2025, I entered into a settlement agreement with Modern HR, Inc. to satisfy the Modern HR Judgment for a total of $530,000 in installments. As of today, $475,000.00 has been paid to Modern HR to satisfy the Modern HR Judgment, and I intend to continue paying Modern HR the monthly installments until the Modern HR Judgment is satisfied.

61.     As set forth in the Declaration of Joshua M. Sable on behalf of Modern HR ("Modern HR Declaration") annexed hereto as **Exhibit C**, Modern HR supports this Motion to Dismiss.  As set forth in the Modern HR Declaration, one of the Alleged Debtor's largest judgment creditors does not believe that the involuntary petition is in the best interest of the creditors but instead was unilaterally filed by the Petitioning Creditor to obtain a disproportionate advantage for itself.

### iii.     IWC Judgment

62.     On or about December 23, 2024, I entered into a Settlement Agreement with IWC Innovations, Inc. ("IWC") for the total amount of $160,000.00, plus interest, pursuant to which I am required to make monthly installments. As of today, $46,968.45 has been paid to IWC to satisfy the IWC Judgment and I am presently current on my monthly obligations to IWC.

### iv.     Aztec Judgment

63.     On March 15, 2024, a judgment in favor of Aztec Leasing, Inc. ("Aztec") was entered jointly and severally against me and SA Hospital Real Estate Holdings-Jefferson, LLC in the principal amount of $410,569.67 ("Aztec Judgment").

### v.     The Alleged Debtor's Other Debt Obligations

64.     I have other debt obligations arising from the SA Hospital transaction. Specifically, I owe approximately $1,500,000 to Twain Financial Partners on account of the 99-year ground lease for SA Hospital, which I guaranteed jointly and severally with Ahlholm.

12

65.    In addition to the above-mentioned judgment creditors, I owe money to: (i) Matthew Haddad ("Haddad")  and entered into a promissory noted in Haddad's favor for $200,000, plus interest, all of which remains outstanding, for which I personally guaranteed; (ii) Frank Sadaira ("Sadaira") entered into a promissory note in Sadaira's favor for $125,000, plus interest, all of which remains outstanding, for which I personally guaranteed; and (iii) Goldberg Healthcare Partners ("GHP") and entered into a promissory noted in GHP's favor for $350,000, all of which remains outstanding, for which I personally guaranteed; (iv) J. Supple Law, APC for $124,893; and (v) Jack Dwyer, Esq. for $12,221 for outstanding fees for legal services rendered.

66.    I have also entered an installment payment plan with the State of Arizona to pay certain tax obligations, for which a balance of $19,521.00 remains outstanding. I am current on these monthly payments to the State of Arizona.

67.    Lastly, I have at lines of credit with at least three (3) credit cards at various banks, all of which have outstanding amounts as follows: (i) Bank of America with outstanding balance of $7,773.00; (ii) JP Morgan Chase Bank with an outstanding balance of $7,209.00 and (iii) second JP Morgan Chase Bank credit card with an outstanding balance of $8,226.00.

Dated: April 14, 2026
    Cedarhurst, New York

*s/ Lawrence Edward Feigen*
Lawrence Edward Feigen
Alleged Debtor

13